**Lewis H. SWORD et al., Appellees,**

v.

**James W. FOX et al., Appellants.**

**No. 15391.**

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1971.

Decided July 1, 1971.

William G. Broaddus, Asst. Atty. Gen., of Virginia (Andrew P. Miller, Atty. Gen., of Virginia, D. Patrick Lacy, Jr., Asst. Atty. Gen., and James R. Sipe,

Harrisonburg, Va., on brief), for appellants.

John C. Lowe, Charlottesville, Va. (Robert P. Dwoskin, and Lowe, Dwoskin & Gordon, Charlottesville, Va., on brief), for appellees.

Before BRYAN, BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge.

This is a class action, brought on behalf of all the students at Madison College, for a declaratory judgment that certain regulations governing demonstrations at such college were constitutionally invalid as overbroad and vague and as impermissible restraints on freedom of speech and assembly. Madison College is a State-supported institution, located at Harrisonburg, Virginia, with a student body of approximately 4,000, mostly women.

The regulations under attack, which were adopted three years before the incidents involved here and which are included in the Student Handbook made available to all students on matriculation,[1] are concerned with student protests and demonstrations on the college campus. After setting forth a definition of demonstrations, the regulations require generally that any proposed demonstration "be registered with the Office of Student Activities 48 hours in advance". Other than this requirement of registration, the regulations impose no direct restrictions except the one specifically involved here, i. e., that "Demonstrations are forbidden in the areas of the Health Center, *inside any buildings* and congregating in the locations of fire hydrants". (Italics added)

Thus, the president of the college stated without contradiction that, to his knowledge, the regulations had never been applied "to prohibit the desire of students to meet and demonstrate in areas of the campus".[2] One of the witnesses called by the plaintiffs, a student who had engaged in the "sit-ins" involved in this action, testified that, while written application to register a demonstration was required, the registrant did not set forth thereon the purpose of the demonstration, only the time the demonstration was to begin and the areas where it was to be held; and that except for "making a few changes in some of the areas where the demonstration was to be held", "automatic approval" of the registration followed.[3] Thus the regulations, neither by their language nor by their application, are instruments for censoring or controlling the purpose or content of a demonstration.

The situation which generates this controversy began on Thursday evening, April 23, when a group of students organized a mass meeting of students to protest the termination of the services of certain teaching personnel at the college. Such protest meeting was duly registered in conformity with the college rules. After the meeting, however, a group of students determined to move on to Wilson Hall, a combination administration and classroom building, in which the office of the college president was located, and, as a part of their protest demonstration, to remain there overnight, engaging in "a sleep-in in front of the President's office". Some had brought sleeping bags; others sat or lounged about on benches or chairs. About an hour and a half afterwards, the Dean of Student Services

---

1. These regulations are set forth in the opinion of the District Court as reported in 317 F.Supp. 1055, at pp. 1067–1069.

2. App., pp. 110 and 118.

3. App., pp. 99–100. There is some discussion in the testimony about the different rules applicable to requisitioning a building for a meeting and registering a demonstration. A building or area *is* apparently requisitioned for what is deemed a normal college function. Application

for this purpose is made to the Provost of the College. On the other hand, demonstrations as defined in the rules are registered with the Director of Student Activities. *The students seemingly recognized the difference between the two proceedings.* At any rate, there was no misunderstanding in connection with the two "sit-ins" involved here. The students *sought to register them as demonstrations* with the Director of Student Activities. App., p. 143.

came to the building, advised the group that they were violating the college regulations by a demonstration in Wilson Hall and warned them of the sanctions provided in the Student Handbook for demonstrations within a college building. Some of the students left; others remained until given a second warning about an hour later. On the next day, a group of students sought to register a "vigil" as they described it, to be held 48 hours later in Wilson Hall. The Dean of Student Services refused to register it because it would constitute "a demonstration inside a building" impermissible under the college regulations. Despite this denial, the students staged a "sit-in" on the night of April 26 in Wilson Hall. College officials came to the building on three occasions, requested the students to leave, and warned of the consequences should they fail to leave. After the first request to leave, some of the students departed but a substantial number remained. Other students joined the group in the building and a large number gathered in front of the building. There was singing and chanting, both from within the building and from the group that had gathered outside, but no violence or destruction of property. Finally, the police were called and a number of students engaged in the "sit-in" were arrested and charged with trespass under State law.[4] Disciplinary action was begun against some of the students involved in the "sit-in" and one, it

seems was suspended and others were subjected to some type of disciplinary action. Three days later, the appellees and others had a demonstration on the campus to protest both the punishment of the appellees and the failure to continue the employment of certain members of the faculty. This subsequent demonstration was registered without any difficulty, and there was no attempt by the college authorities to censor its content or to control or limit its purposes.

By this proceeding, the plaintiffs sought a declaratory judgment that the regulations proscribing their "sit-ins" in Wilson Hall were constitutionally invalid and for an injunction prohibiting the college from imposing any punishment on account of such "sit-ins". The District Court, on motion for summary judgment, granted the relief sought. We reverse.

■ It should be recalled at the outset, that, according to the uncontradicted testimony[5] of the college's president, the college, acting under these regulations, had never denied any student group the right to demonstrate nor were the students involved in the "sit-ins" with which this action is concerned ever denied the right to demonstrate in protest. As has been pointed out, these students actually did demonstrate, after registration of their demonstration, as required under these regulations, both before and after the "sit-ins" in Wilson Hall.[6] Nor

4. A number of students, including the appellees, have been prosecuted under the State trespass statute because of their involvement in' these demonstrations. They have already been tried and convicted in the State Courts and their convictions are on appeal. Such appeals will turn on the validity of the very regulations challenged in this action. Whether under the recent decisions in Younger v. Harris (1971) 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, and related cases, this court should abstain in favor of the State Court and permit it to determine the validity or invalidity of the instant regulation in the criminal action was not raised by either party and, for that reason, we do not reach the question. Cf., LeClair

v. O'Neil (3-Judge Court, D.C.Mass.1969) 307 F.Supp. 621, 624, note 4.

5. On appellees' motion for a temporary injunction, the District Court heard certain testimony. This testimony was incorporated into the record on the hearing of the motion for summary judgment.

6. This distinguishes this case from Hammond v. South Carolina State College (D.C.S.C.1967) 272 F.Supp. 947, and Jones v. Board of Regents of University of Arizona (9th Cir., 1970) 436 F.2d 618, both of which dealt with an absolute bar on a demonstration or distribution of handbills. Both these cases, however, recognized that a college or university might constitutionally impose "reasonable rules

was any attempt made to control or even influence the purpose of their demonstrations or, so far as the record shows, any other demonstrations on campus; indeed, the form of registration required to be filed with the Director of Student Activities, did not request information with reference to the demonstration's purpose.[7] What was denied these students—and all that was denied them— was the right to demonstrate by a "sit-in" *specifically in Wilson Hall*. It is thus not the *right* to protest but the *place* of protest that was regulated and is involved in this appeal.[8] The 48-hour registration requirement under the regulations, though referred to in the briefs filed by the parties, is similarly not in issue.[9] That regulation was not invoked against the appellees;[10] in fact, it seems to have been liberally enforced. The only portion of the challenged regulations under which the appellees were threatened with disciplinary action concerned, not the right generally to demonstrate nor the requirement of 48 hours' prior registration of a demonstration,

but specifically the college's denial of the right to demonstrate within a college building, a building which housed the administrative offices of the college and certain classrooms. It is only that regulation so applied, that appellees have standing to challenge. See United States v. Raines (1960) 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed.2d 524, and LeClair v. O'Neil, *supra* (pp. 624–625 of 307 F. Supp.). To repeat, the basic question presented by the appeal is whether a State-supported college, while permitting generally and without discrimination demonstrations elsewhere on its campus, may, in consonance with the First Amendment, deny students the right to demonstrate and protest by way of a "sit-in" within a combination classroom and administrative building.[11]

▉▉▉ Although it may be taken as settled that a college student, by his enrollment, is not stripped of his constitutional right to engage in "symbolic" speech in the form of demonstrations of protest,[12] this does not mean that the

---

regulating the time, place, and manner of the exercise of First Amendment rights." (Page 620 of 436 F.2d, 272 F.Supp. pp. 950–951).

7. App., pp. 99–100.

8. In the testimony of the Director of Student Services, he described the action taken thus:
   "Q. So you disapproved this registration or demonstration?
   "A. I did not disapprove a demonstration. I disapproved the location of that particular demonstration and in fact a demonstration on the same topic by the same people was held about three days later for 36 hours without there was no problem. * * *" (App., p. 142)

9. That such requirement, if applied to these demonstrations, would not have been invalid, see Powe v. Miles (2d Cir. 1968) 407 F.2d 73, 84. A similar requirement was suggested as valid in Wolin v. Port of New York Authority (2d Cir. 1968) 392 F.2d 83, 94:
   "* * * some guidelines are in order. In accommodating the interest of protestors and general public, the Port Authority may set approximate and reasonable limitations on the number of

persons who may engage in such activities at any specific time, the duration of the activity and the specific places within the building where the rights of expression may be exercised."

10. App., p. 111.

11. Cf., Cohen v. California, 403 U.S. 15, p. 19, 91 S.Ct. 1780, p. 1785, 29 L.Ed.2d 284:
   "In the first place, Cohen was tried under a statute applicable throughout the entire State. Any attempt to support this conviction on the ground that the statute seeks to preserve an appropriately decorous atmosphere in the courthouse where Cohen was arrested must fail in the absence of any language in the statute that would have put appellant on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law, not be tolerated in certain places. See Edwards v. South Carolina, 372 U.S. 229, 236–237, 83 S.Ct. 680, 683–684, 9 L.Ed.2d 697, and n. 11 (1963) Cf. Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)."

12. Saunders v. Virginia Polytechnic Institute (4th Cir. 1969) 417 F.2d 1127, 1130; Dixon v. Alabama State Board of Educa-

exercise of such right is absolute and unlimited.[13] While a flat ban on campus demonstrations would be manifestly invalid, "It is equally clear, however, that students do not have an unlimited right to demonstrate on university property. As in the case of other public facilities, a university may place reasonable restrictions on demonstrations to protect safety and property, maintain normal operations, facilitate campus traffic, and the like." [14] This accords with the general principle as expressed in Amalgamated Food Employees Union Local 590 v. Logan Val. Plaza (1968) 391 U.S. 308, 320, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603:

> "Even where municipal or state property is open to the public generally, the exercise of First Amendment rights may be regulated so as to prevent interference with the use to which the property is ordinarily put by the State."

In line with this principle, it has been often observed that, "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." Cox v. Louisiana (1965) 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471; Adderley v. Florida (1966) 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 and Abernathy v. Conroy (C.A.4, 1970) 429 F.2d 1170, 1173–1174.[15] It is clear from the foregoing that a college may adopt and enforce reasonable, nondiscriminatory rules governing demonstrations on its campus.

■ In determining whether a college regulation restricting demonstrations is reasonable, the Courts must take into consideration both "the special characteristics of the school environment," [16] and that the regulation of student conduct is ordinarily the prerogative of the college authorities, with judicial intervention only when the circumstances are such as to "directly and sharply implicate basic constitutional values." [17] For these reasons, the "precedents about the meaning of the first amendment in other areas of life can (not) be indiscriminately transferred to the university setting." Wright, The Constitution on the Campus.

---

tion (5th Cir. 1961) 294 F.2d 150, 156–157, cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193; Esteban v. Central Missouri State College (8th Cir. 1969) 415 F.2d 1077, 1085; Soglin v. Kauffman (7th Cir. 1969) 418 F.2d 163, 165–166.

13. Esteban v. Central Missouri State College, *supra*, (pp. 1086–1087 of 415 F.2d).

See, also, Cox v. Louisiana (1965) 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487, in which "the Court held valid on its face a statute forbidding picketing and parading near a courthouse. This was deemed a valid regulation of conduct rather than pure speech. The conduct reached by the statute was 'subject to regulation even though (it was) intertwined with expression and association.'" Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 1691, 29 L.Ed.2d 214, filed June 1, 1971 (dissenting opinion of Justice White).

14. Developments in the Law of Academic Freedom, 81 Har.L.Rev. 1045, 1131 (1968).

15. See, also, Groppi v. Froehlich (3-Judge Court, D.C.Wis., 1970) 311 F.Supp. 765, 770:

"'Fair use' of the opportunity for public discussion and demonstration may not be denied. (Citing authorities) However, it has been consistently recognized that there are places in which and times at which speeches and meetings and demonstrations may be prohibited."

16. Tinker v. Des Moines Independent Community School Dist. (1969) 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731; 55 Minn.L.Rev. 116, at pp. 127–8 (1970).

17. Epperson v. Arkansas (1968) 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228; Barker v. Hardway (D.C.W.Va.1968) 283 F.Supp. 228, 235, aff. 4 Cir., 399 F.2d 638, cert. den. 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217; Sill v. Pennsylvania State University (D.C.Pa.1970) 318 F.Supp. 608, 616. See, also, the cautionary statement in note, 48 N.C.L.Rev. 943, (1970):

"But the courts have been extremely reluctant to scrutinize substantive rules that govern student behavior and more reluctant still to void such rules because of constitutional infirmity."

22 Vanderbilt Law Rev. 1027, 1038. Specifically, the test for the reasonableness of college regulations is whether such regulations "measurably contribute(s) to the maintenance of order and decorum within the educational system",[18] are calculated to prevent interference with "'the normal activities of the University'"[19] or obstruction to its function "to impart learning and to advance the boundaries of knowledge",[20] or are important in maintaining "order" and "normal operations".[21] In testing any college regulation for reasonableness under these criteria,[22] the Courts, it should be emphasized, are not concerned with "whether such rules are wise or expedient but merely whether they are a reasonable exercise of the power and discretion of the school authorities." Burnside v. Byars, *supra* (363 F.2d at p. 748).[23]

■ The regulation involved here, which bans demonstrations in college buildings but not otherwise, tested by the criteria just stated, is reasonable. As has been observed, it does not purport to pass on the purpose of the demonstration. Nor has it been used to deny to students the right to protest on campus, provided only such protests are not carried on within a college building. Its purpose is manifest. College buildings are generally dedicated to classrooms, administrative offices, libraries, health centers, or dormitories. In all of these, order and study are expected. It can scarcely be argued that demonstrations in a classroom or administration building during day would not create a disruption in the educational activity of the institution and inconvenience its normal administrative operations.[24] At night, on the other hand, demonstrations in such buildings offer too many opportunities for vandalism, and, in some instances, lawlessness. It is for this reason that demonstrations, even in the public streets, have been prohibited in the nighttime. Abernathy v. Conroy, *supra* (429 F.2d at p. 1174); Cottonreader v. Johnson (D.C.Ala.1966), 252 F.Supp. 492, 500. In dormitories, where students are entitled to the quiet necessary both for sleep and study, demonstrations,

18. Burnside v. Byars (5th Cir. 1966) 363 F.2d 744, 748.

19. Wright, *supra* (at pp. 1041–2, 22 Vanderbilt Law Rev.)

20. Goldberg v. Regents of Univ. of California (1967) 248 Cal.App.2d 867, 57 Cal. Rptr. 463, 472; 21 Syracuse L.Rev. 1260 (1970).

21. 81 Harv.L.Rev. 1048, 1131 (1968); cf., Waugh v. Board of Trustees of University of Mississippi (1915) 237 U.S. 589, 35 S.Ct. 720, 59 L.Ed. 1131.

22. A distinction must be made between what are designated as "ad hoc" rules (i. e., rules adopted to meet a present situation) and general rules. See Burnside v. Byars, *supra*. This distinction is recognized in the brief of appellees. (Page 2, Brief for Appellees).

23. See, also, Dickey v. Alabama State Board of Education (D.C.Ala.1967) 273 F.Supp. 613, 617–618:

"This Court recognizes that the establishment of an educational program requires certain rules and regulations necessary for maintaining an orderly program and operating the institution in a manner conducive to learning.

However, the school and school officials have always been bound by the requirement that the rules and regulations *must be reasonable*. Courts may only consider whether rules and regulations that are imposed by school authorities are a reasonable exercise of the power and discretion vested in those authorities. Regulations and rules which are necessary in maintaining order and discipline are always considered reasonable." (Italics in opinion)

24. See, Van Alstyne, The Judicial Trend Toward Student Academic Freedom, 20 U. of Fla.L.Rev. 290, 300:

"Indeed, the administrative inconvenience of having to accomodate ad hoc demonstrations in certain locations (for example, the president's office or inside a classroom building), may justify a rule placing some facilities entirely off limits as a political forum, even though a given demonstration might itself not happen to be disruptive."

See, also, the comment in Regulation of Demonstrations, 80 Harv.L.Rev. 1773, 1776–7 (1967):

"Similarly, the very presence of demonstrators in public buildings may upset normal operations."

which, though not violent, are generally noisy, interfere with that decorum expected in the "normal operations" of the college. It is plain, therefore, that a regulation which prohibits demonstrations within the college buildings "measurably contribute(s) to the maintenance of order and decorum within the educational system" and represents "a reasonable exercise of the power and discretion" of the college authorities. Grossner v. Trustees of Columbia University in City of N. Y. (D.C.N.Y.1968), 287 F. Supp. 535, 544–545, so held. This certainly should be the rule, when, as here, demonstrations, without any restriction of purpose, are permitted in other areas of the campus.

■■ The appellees, as well as the District Court's opinion, assume that the reasonableness, and thus the validity, of the regulation, as applied to them, is to be determined by whether the particular demonstrations involved here were violent or peaceful and they contend that if their demonstrations were peaceful, even though violative of the regulation, the regulation would be invalid as applied to them and their demonstration. Such argument is untenable.[25] The proposed demonstration in Abernathy v. Conroy, *supra* (429 F.2d p. 1174), was, so far as the record indicated, to have been peaceful and this did not void the ordinance prohibiting night demonstrations. There was, as Justice Douglas pointed out in his dissent, " * * * no violence; no threat of violence; no attempted jail break; no storming of a prison; no plan or plot to do anything but protest" in Adderley v. Florida, *supra* (385 U.S. at p. 51, 87 S.Ct. at p. 249), but this did not void a conviction under the state statute on trespass. The issue in this case, as has been already observed, is the reasonableness of the general regulation promulgated by the college and published in its Student Handbook. Just as the ordinance in *Abernathy* and the statute in *Adderley,* were measured for

reasonableness, the reasonableness of the regulation involved here is to be resolved, not by the peculiar facts involved in these particular "sit-ins" that gave rise to this controversy—whether they were violent or not—but by the inquiry whether such regulation was reasonably connected generally with preventing interference with "the normal activities" of the institution. If the regulation was reasonable by this standard and thus within the power of the college, it is immaterial whether the appellees, in violating the regulation, were violent or peaceful. The rationale of this conclusion is well stated in Bayless v. Martine (5th Cir. 1970) 430 F.2d 873, 879:

"When a general regulation such as that contained in Hill Hints had been made explicitly applicable to the students here involved and they had been fully apprised of the penalty to be meted out for violation of the regulation not only by the Dean's direct statements to them but by the express provisions of the Student Discipline and Conduct Code, which was printed and distributed as a part of the Hill Hints handbook, then the University's right to discipline an erring student is not contingent upon the extent of disruption caused by his direct disobedience of the regulation."

■ The appellees urge, though, that public buildings, such as that involved here, may not be closed to demonstrators, that any regulation so closing them would be unreasonable, and they would deny the value of *Grossner* as a precedent. In support, they cite Edwards v. South Carolina (1963) 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; Brown v. Louisiana (1966) 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637, and Wolin v. Port of New York Authority (2d Cir. 1968) 392 F.2d 83, cert. den. 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275. None of these authorities, it seems to us, supports the position of the appellees. *Edwards* involved the right to demonstrate on State

---

25. In advancing this argument, appellees fail to recognize the distinction between *ad hoc* and general rules previously promulgated. See note 22.

House grounds, not in a building. *Brown* was basically an equal protection case, not a First Amendment case. The "prevailing opinion" [26] recognized that, "A State or its instrumentality may, of course, regulate the use of its libraries or other public facilities" but held that it must do so "in a reasonable and undiscriminatory manner, equally applicable to all and administered with equality to all. It may not do so as to some and not as to all. It may not provide certain facilities for whites and others for Negroes," specifically, "Negroes could not be denied access (to a public library) since white persons were welcome." (383 U.S. at pp. 139 and 143, 86 S.Ct. at p. 724). It was the failure of equal and non-discriminatory treatment that invalidated the State action in that case. Moreover, some of those Justices who concurred in the result reached in the "prevailing opinion" did so on the ground that an essential element of the crime in the statute was intent to provoke a breach of the peace and that there was a complete absence of evidence of any such intent. (383 U.S. at pp. 161–162, 86 S.Ct. 719). In *Wolin* the issue concerned the right to distribute handbills in a building which really was used, in part, as a passageway or street for the commuting public of New York City. To a substantial extent, the building was similar to a public street through which daily hundreds of thousands of commuters passed.[27] Even here, where the structure might well be deemed, in part at least, a quasi-street, the Court recognized the right of the public authority, by proper regulation, to proscribe demonstrations or distribution of handbills in certain areas of the building, presum-

ably the areas not used as a public passageway.

In summary, in our opinion, the regulation proscribing the use of college buildings for demonstrations, especially as applied to the particular building involved here, is a valid and reasonable exercise of the authority of the college to promulgate and enforce rules and regulations and does not represent an unreasonable limitation upon the First Amendment rights of the appellees and the class they represent.

In addition to assailing the regulation as invalid under the First Amendment, the appellees argue, and the District Court found, that the regulation was violative of due process because of vagueness and overbreadth. This claim focuses upon the specificity required in college rules and regulations. As the District Court remarked, there is a sharp divergence in the cases on this question [28] but all seem to agree that the same specificity is not required in college rules as is necessary in criminal statutes. Jones v. Snead (8th Cir. 1970) 431 F.2d 1115, 1117; Banks v. Board of Public Instruction of Dade County (3-Judge Court, D.C., Fla., 1970) 314 F.Supp. 285, 290. The general rule on vagueness, as it has been developed in connection with the construction of criminal statutes, is that all that is required is that the language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices". United States v. Petrillo (1947) 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877. Even measured by this standard, the regulation, in its definition of "demonstration", is

---

26. There were a number of opinions in this case. The opinion of Justice Fortas was described as the "prevailing opinion" in Justice Black's dissent. (383 U.S. at p. 152, n. 1, 86 S.Ct. 719). It is of some significance that the minority in *Brown* became the majority in *Adderley*.

27. Cf. Massachusetts Welfare Rights Organization v. Ott (1st Cir. 1969) 421 F.2d 525, 527, n. 4:

"A welfare office is not to be equated with a public street."

28. Cf. Whitfield v. Simpson (3-Judge Court, D.C.Ill., 1970) 312 F.Supp. 889, 896, and Soglin v. Kauffman (7th Cir. 1969) 418 F.2d 163, 168, on sufficiency of the term "misconduct" in a college regulation.

sufficiently definite. Actually, "demonstration" itself is a fairly definite descriptive term. It had no added descriptive words in the ordinance involved in Shuttlesworth v. City of Birmingham (1969) 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162, and, while the point was not adverted to in that decision, it seems unlikely the vulnerability of the term to a charge of vagueness, if valid, would have passed unchallenged in that case. The appellees here apparently did not find the terms confusing or unclear. They sought to register their "vigil" or "sit-in"—whatever its proper description —as a demonstration under the college regulation. The language was "sufficiently definite" that they knew their planned activity came within the regulation's definition of "demonstration" and required registration. There can be no question that the appellees intended "a public manifestation of * * * protest * * * by a mass * * * occupation of premises." And, in their brief, the appellees concede that the definition of "demonstration" is "based on terms which are susceptible to common understanding". Despite this concession, the appellees press the point that the definition, taken in the context of all the related rules, becomes vague because it is "used in a strictly negative sense" and "for purposes either of limiting it or completely prohibiting such activity". The premise on which this argument rests is, in our judgment, unsound and contrary to the facts in this case. The regulations, as has already been emphasized, do not, and have not been applied, to prohibit all demonstrations on campus; they only ban those in college buildings. And, as so limited, we have held they are reasonable.

The District Court, also, thought the definition of "demonstration" in the regulation defective, too, because it exempted "social and athletic activities" from its definition. It occurs to us that the exemption was unnecessary. "Demonstration" connotes, in the context of this regulation, a public manifestation primarily of protest or condemnation.

"Social and athletic activities" do not fit into this connotation, and, even though not expressly exempted, could be construed as outside the definition of the bare term "demonstration". Further, the exemption, even if required, is warranted. It is to be assumed that all "social and athletic activities" have their own special regulations and are carried out under college supervision. Such is not true of demonstrations of the character covered by these regulations.

 Finally, the District Court found the regulations overbroad. Applied to the specific building where the "sit-in" involved here took place, it is clear the regulation is not overbroad, whether applied during the day or night. For the reasons already given, we regard the application of the regulation as reasonable and within the proper authority of the college.

The decision of the District Court is accordingly reversed and the action is remanded with instruction to dismiss the complaint.

Reversed and remanded.